**Joseph and Carolyn FRIEDBERG, Plaintiffs,**

**v.**

**CHUBB AND SON, INC., and Chubb Indemnity Insurance Company, Defendants.**

**Civil No. 08–6476 (DSD/JJK).**

United States District Court, D. Minnesota.

May 26, 2011.

Jenneane L. Jansen, Esq., Jansen & Palmer LLC, and Steven E. Wolter, Esq., Kelley, Wolter & Scott, P.A., for Plaintiffs.

David E. Bland, Esq., Robins Kaplan Miller & Ciresi LLP, for Defendants.

## ORDER

JEFFREY J. KEYES, United States Magistrate Judge.

This matter came before the Court on Plaintiffs' First Motion to Amend Complaint. (Doc. No. 58). Based on the parties' submissions and arguments, together with all pleadings, records, and files herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' First Motion to Amend Complaint (Doc. No. 58), is **DENIED;** and

2. The attached Memorandum is incorporated by reference.

## MEMORANDUM

### I. BACKGROUND

This insurance coverage dispute arises out of Plaintiffs Joseph and Carolyn Friedberg's (Plaintiffs or Friedbergs) purchase of the Masterpiece Policy (the Policy) in 2001 from Defendants Chubb & Son, Inc. and Chubb Indemnity Insurance Company (collectively, Chubb). The Policy covered Plaintiffs' primary residence in Wayzata, Minnesota, and other articles and properties. As an all-risk Policy, this insurance policy basically covered everything unless specifically excluded. The Policy exclusions were as follows:

> **Gradual or sudden loss** (Rot Exclusion). We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies (Ensuing Loss Provision).

> . . . .

> **Fungi and Mold** (Mold Exclusion). We do not provide coverage for the presence of mold, however caused, or any loss caused by mold, other than as provided under the Extra Coverage, [m]old remediation expenses. But we do cover mold resulting from fire or lightning unless another exclusion applies. Mold means fungi, mold, mold spores, myco-

toxins, and the scents and other byproducts of any of these.

> . . . .

> **Faulty planning, construction or maintenance.** (Construction Defects Exclusion). We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance. It does not matter whether the faulty acts, errors or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. Planning includes zoning, placing, surveying, designing, compacting, setting specifications, developing property and establishing building codes or construction standards. Construction includes materials, workmanship, and parts or equipment used for construction or repair.

(Doc. No. 22, Affidavit of Steven E. Wolter (Wolter Aff.), at Ex. 1) (emphasis in original).

In December 2006, Plaintiffs hired Donnelly Stucco (Donnelly) to repair a small hole in the exterior of their home. (*Id.* at Ex. 2 at 26, 31.) While conducting the repair, Donnelly discovered extensive water damage. (*Id.* at 32.) Plaintiffs notified Chubb of the loss on January 22, 2007. (*Id.* at 31.) On January 31, 2007, Chubb adjuster Scott Bestland (Bestland) and expert Dr. Larry Gubbe (Gubbe) inspected Plaintiffs' home. (*Id.* at Ex. 4 at 73.) Sample cuts into the home's exterior revealed water intrusion causing rot, mold, and damage to the home's wood framing and insulation. (*Id.* at 244–78, 383–404.) Bestland's Inspection Report noted the failure of the Dryvit cladding—an exterior insulation and finish system (EIFS) that covered the home's wood frame—as a cause and origin of the damage. (Doc. No. 25, Decl. of Scott Bestland (Bestland Aff.)

¶ 3, Ex. A at 23.) According to the Inspection Report: [I]t appears that Dryvit has failed due to no vertical 'control/expansion' joints that result in Dryvit cracking because it cannot expand or contract. Once the Dryvit cracks, moisture can get behind resulting in deterioration within the exterior walls.... Also, evidence of poor design and workmanship. (*Id.*)

Gubbe inspected the Friedbergs' home again in April 2007 after the Dryvit cladding had been removed. In a July 23, 2007 report, Gubbe detailed the results of the January and April inspections, noting water damage to the home's architectural beams, roof deck, and sheathing and framing members. (Wolter Aff. ¶ 5, Ex. 4 at 73, 75–76.) Gubbe concluded that the damage to the architectural beams and underlying walls was primarily caused by the failure to install control joints or otherwise to provide for differential movement which caused the beams to develop cracks through which water could penetrate the EIFS cladding. (*Id.* at 78.) Further, Gubbe found that the damage attributable to inadequate design and construction of the beams ... has been cumulatively occurring over a period of several years and was not attributable to a single event such as a storm or other climatic phenomena. (*Id.*)

On August 7, 2007, Chubb denied Plaintiffs' claim on the basis that the sustained damage was excluded under the Policy. (*Id.* ¶ 17, Ex. 16 at 81–82.) According to Chubb, based on the inspections, it was evident that water has intruded via the exterior roof and wall for some time, resulting in gradual deterioration. (*Id.*) On December 3, 2008, Plaintiffs filed a Complaint in state court, seeking a declaratory judgment that the Policy covers the damage to their home, and asserting breach of contract and estoppel claims. Chubb then

removed this action to federal court. (Doc. No. 1.)

On February 6, 2009, Plaintiffs instituted a separate suit in Hennepin County District Court against Marcus Blue d/b/a/ Arrow Construction U.S.A. Inc., a company Plaintiffs hired to repair the roof of the home. The Complaint against the roofer alleged that:

> As a direct result of the faulty workmanship and defective construction practices of [Marcus Blue], the Home has suffered or will suffer continuous water entry into the wall cavities of the Home causing significant damage, including, without limitation, the following: deterioration of the wall sheeting and interior wallboard, deterioration of the structural framing members, widespread growth of mold, mildew and fungus, reduced deficiency due to excess air, water and sound leakage, and structural distress and vulnerability due to freezing and thawing deterioration when wet materials are exposed to freezing temperatures.

(Wolter Aff. ¶ 23, Ex. 22 ¶ 8.)

On November 5, 2009, Plaintiffs moved for partial summary judgment on the declaratory judgment claim, which Judge Doty denied. (Doc. No. 19.) There, Plaintiffs argued that: (1) the damages alleged to have occurred to their residence are covered losses; (2) the exclusions relied upon by Chubb do not apply; and (3) even if the exclusions applied, they should still be afforded coverage under the ensuing loss provisions, which revive any coverage otherwise excluded under the Chubb policies. (*Id.*) To that effect, Plaintiffs argued that Gubbe's report and their own consultants' evidence demonstrate that water damage—a covered peril—caused their loss, not faulty construction, mold, or rot. Plaintiffs alternatively argued that faulty construction, mold, and rot only indirectly

contributed to their loss, and that coverage is proper because Chubb has not shown that the excluded peril was the sole, overriding cause. (*Id.*)

Judge Doty held that Plaintiffs established a prima facie case of coverage and that their losses were covered unless an excluded peril was an overriding cause of the loss. (Doc. No. 48, March 30, 2010 Order at 7, 10, 2010 WL 1286082.) He nonetheless denied summary judgment, finding that based on the evidence presented, a reasonable jury could determine that the overriding cause was poor construction, water intrusion, or both. (*Id.* at 10.) And he concluded that a determination of whether the Policy covers Plaintiffs' loss turned on this factual finding. (*Id.*) Judge Doty also rejected Plaintiffs' argument that even if coverage were excluded, summary judgment was still warranted because the Policy's ensuing loss provisions provide an exception to the exclusion. Judge Doty held that without a factual determination of the overriding cause of the Friedbergs' loss, the court can only hypothesize as to whether an exclusion containing an ensuing loss clause applies, and whether the Friedbergs' loss was the consequence of that excluded peril. Therefore, the court declines to grant summary judgment on this basis. (*Id.*)

Plaintiffs now move to amend the Complaint to assert a bad-faith claim under the new Minn.Stat. § 604.18, which allows up to $250,000 in taxable costs and up to $100,000 in attorneys' fees if the statutory elements are satisfied. (Doc. No. 58.)

## II. DISCUSSION

### A. Legal Standard

■ Except where amendment is permitted as a matter of course, under Federal Rule of Civil Procedure 15, a party may amend its pleading only with the opposing party's written consent or the court's leave

[and] [t]he court should freely give leave when justice so requires. Fed.R.Civ.P. 15(a)(2). The decision whether to grant leave to amend rests in the discretion of the trial court. *Niagara of Wis. Paper Corp. v. Paper Indus. Union–Mgmt. Pension Fund,* 800 F.2d 742, 749 (8th Cir. 1986). The amendment may be denied when it would not withstand a motion to dismiss and is thus futile. *DeRoche v. All Am. Bottling Corp.,* 38 F.Supp.2d 1102, 1106 (D.Minn.1998) (stating that a futility challenge to a motion to amend a complaint is successful where claims created by the amendment would not withstand a Motion to Dismiss for failure to state a claim upon which relief can be granted); *see also Lunsford v. RBC Dain Rauscher, Inc.,* 590 F.Supp.2d 1153, 1158 (D.Minn. 2008) (stating that a motion to amend is futile if the amended complaint would not survive a motion to dismiss).

Here, Plaintiffs seek to amend to assert a claim for bad-faith denial of insurance coverage under Minn.Stat. § 604.18. As with punitive damages claims in Minnesota, the Court is expected to exercise a gate-keeping function to review these claims before they can proceed:

> Upon commencement of a civil action by an insured against an insurer, the complaint must not seek a recovery under this section. After filing the suit, a party may make a motion to amend the pleadings to claim recovery of taxable costs under this section. The motion must allege the applicable legal basis under this section for awarding taxable costs under this section, and must be accompanied by one or more affidavits showing the factual basis for the motion. The motion may be opposed by the submission of one or more affidavits showing there is no factual basis for the motion. At the hearing, if the court finds prima facie evidence in support of

the motion, the court may grant the moving party permission to amend the pleadings to claim taxable costs under this section.

Minn.Stat. § 604.18, subd. 4.

As described below, the Court concludes that Plaintiffs have failed to meet their burden to come forward with the evidence sufficient to make the requisite showing of bad faith under the statute and thus open the gate to recovery of the statutory damages and attorneys' fees under Minn.Stat. § 604.18, subd. 3. Therefore, because Plaintiffs' proposed bad faith claim does not meet the statutory requirements of Minn.Stat. § 604.18., the amendment is futile and should be denied.

## B. Plaintiff's Bad–Faith Claim

In 2008, the Minnesota Legislature created a private cause of action for bad faith in first-party insurance. The statute allows taxable costs as a penalty if the insured can show: (1) the absence of a reasonable basis for denying the benefits of the insurance policy; and (2) that the insurer knew of the lack of a reasonable basis for denying the benefits of the insurance policy or acted in reckless disregard of the lack of a reasonable basis to do so. Minn.Stat. § 604.18, subd. 2(a). Policyholders can be awarded up to $250,000 in taxable costs and up to $100,000 in attorneys' fees if both elements are satisfied. *Id.* subd. 3(a).

 The statute appears to be modeled on other states' first party bad-faith jurisprudence based on a two-pronged test. *See, e.g., Anderson v. Cont'l Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 377 (1978) (setting forth a two-part test for evaluating bad-faith claims). The first prong is an objective standard that asks whether a reasonable insurer would have denied or delayed payment of the claim under the facts and circumstances. *Id.* at 377. Under this prong, courts consider whether the claim was properly investigated and whether the results of the investigation were subjected to reasonable evaluation and review. Whether an insurer has acted reasonably in good or bad faith is measured against what another reasonable insurer would have done in a similar situation. *Poling v. Wis. Physicians Serv.,* 120 Wis.2d 603, 357 N.W.2d 293, 296 (Wis.Ct. App.1984). The second prong is subjective and turns on what the insurer knew and when. *See Adam v. Stonebridge Life Ins. Co.,* 612 F.3d 967, 974 (8th Cir.2010) (stating that the second prong is subjective and applying Iowa law on bad-faith). Knowledge of the lack of a reasonable basis may be inferred and imputed to an insurer where there is reckless indifference to facts or proofs submitted by the insured. *Anderson,* 271 N.W.2d at 377. But when a claim is fairly debatable, the insurer is entitled to debate it, whether debate concerns a matter of fact or law. *Id.* Whether a claim is fairly debatable implicates the question whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded.[1] *Id.*

---

1. Minnesota's new bad-faith statute does not define reasonable basis and there are no published Minnesota state or federal court opinions addressing the issue yet. *See Auto–Owners Ins. Co. v. Sec. Chance Inv. LLC,* No. 27cv10–15620, slip op. at 11–12 (Minn.Dist. Ct. Apr. 11, 2011) (relying on Wisconsin law and stating that the insurer may challenge claims which are 'fairly debatable' after exercising ordinary care and investigating the facts and the applicable law). But courts in other jurisdictions have adopted the fairly debatable standard to evaluate the reasonableness of insurer's denial of benefits. *See Wynia v. Metro. Life Ins. Co., Inc.,* No. 09–5051, 2010 WL 2816264, *9 (E.D.Wash. July 15, 2010) (This 'fairly debatable' standard for determining bad faith, as it is commonly called,

## C. Reasonable Basis for Denial of Insurance Benefits

Plaintiffs have not proffered sufficient prima facie evidence to allege that Chubb's denial of the claim was unreasonable under the applicable facts and law. First, Plaintiffs present no evidence that Chubb sought to shield itself from the facts and otherwise refused to learn the true nature of Plaintiffs' claim. Instead, the record indicates that Chubb conducted a thorough inspection of Plaintiffs' property. Chubb's consultant, Larry Gubbe, found that there was pervasive water damage to architectural beams, the roof deck, as well as sheathing and framing members. Gubbe's report thoroughly discussed the long-term deterioration, rot, and mold to the residence's wood framing and insulation from the significant water intrusion over the years. Ultimately, however, Gubbe concluded that Plaintiffs' damage was primarily caused by the failure to install control joints or otherwise to provide for differential movement which caused the beams to develop cracks through which water could penetrate the EIFS cladding. (Wolter Aff., ¶ 5, Ex. 4 at 78.) He also found that the damage attributable to faulty workmanship of the beams and the roof had been cumulatively occurring over a period of several years, specifically noting that there was no visible evidence of damage attributable to a single event such as a storm or other climatic phenomena. (*Id.*)

Plaintiffs make much to do about the fact that Gubbe opined about damages instead of losses and made no effort to tie any particular types of 'damages' to the 'losses' that the Friedbergs experienced. (Doc. No. 60, Pl.'s Mem. in Supp. of Mot. to Am. (Pl.'s Mem.) 18.) Under Plaintiffs' reading of the Policy, the exclusions apply only to losses, not damages. Plaintiffs contend that the relevant inquiry should have been what portion, if any, of Plaintiffs' losses fell within the policy's exclusions. (*Id.*) To that effect, they argue that Chubb's consultants' conclusion that *damages* were caused by faulty workmanship manifested as gradual deterioration, mold, and rot, does not support a denial of coverage based on the exclusions for *losses* caused by faulty construction, gradual deterioration, or mold. (*Id.*)

First, the Court is not persuaded that Plaintiffs' policy language supports a distinction between damages and losses in the context of exclusions. What is critical here is that Chubb's position that the entire claim is excluded by faulty workmanship is not obviously unreasonable. Indeed, Judge Doty's summary judgment Order stated that a reasonable jury could determine that the overriding cause [of Plaintiffs' loss] was poor construction, water intrusion or both. A determination of whether the Policy covers the Friedbergs' loss hinges on this factual finding. (Doc. No. 48 at 10.) This is buttressed by the Plaintiffs' own contention, in the Marcus Blue litigation against the roofing contractor, that [a]s a direct result of the faulty workmanship and defective construction practices of [Marcus Blue], the Home has suffered or will suffer continuous water entry into the wall cavities of the Home causing significant damage. . . . It may be that Chubb's conclusion that Plaintiffs' loss was primarily caused by faulty construction or workmanship will later prove to be

is followed in the vast majority of jurisdictions) (citing Douglas G. Houser, *Good Faith as a Matter of Law: The Insurance Company's Right to Be Wrong*, 27 Tort & Ins. L.J. 665, 669 (1992) (stating that 36 states follow a fairly debatable-type standard for bad faith claims)). Accordingly, the Court will follow the fairly debatable standard in evaluating whether Chubb had a reasonable basis for denying the benefits under Minn.Stat. § 604.18, subd. 3.

wrong. But even so, bad-faith does not arise where the insurer is simply wrong about the factual basis for its denial of the claim. *See Nunn v. State Farm Mut. Auto. Ins. Co.*, 729 F.Supp.2d 801, 809 (N.D.Tex.2010) (stating that there is no bad faith where [the] evidence shows the insurer was merely incorrect about the factual basis for its denial of the claim, or about the proper construction of the policy); *McGreevy v. Oregon Mut. Ins. Co.*, No. 94–35038, 1995 WL 15630, at *2 (9th Cir. Jan. 13, 1995) (stating that it is not bad faith for an insurer to take a position that later turns out to be wrong); *Hudson Univ. Ltd. v. Aetna Ins. Co.*, 987 F.Supp. 337, 341 (D.N.J.1997) (same). At a minimum, the prima facie record here establishes that Chubb's factual basis for its denial is fairly debatable and thus cannot be in bad faith.

■ Nor can bad faith arise simply because the insurer's construction of the policy was subsequently found to be legally incorrect. *Anderson*, 271 N.W.2d at 377. Thus, even if it later turns out that the policy exclusions distinguish between losses and damages, Chubb's denial, based on its interpretation of the terms, is at the very least fairly debatable and thus not in bad faith.

■ Plaintiffs also argue that Chubb's denial of their claim was unreasonable in light of the applicable law on ensuing losses and concurrent causation. Plaintiffs contend that under Minnesota law, an ensuing loss is one that results from a covered peril that follows as a consequence of an excluded peril. (Pl.'s Mem. at 17.) Plaintiffs also argue that ensuing losses are covered, even if an excluded peril is a but for cause of the loss. Plaintiffs acknowledge that faulty workmanship allowed water to seep into the walls, floors, window sills and the like. But they contend that because water caused some of the damage, and water-related damage is not otherwise excluded, the water-related damage is an ensuing loss covered by the Policy. Chubb, however, contends that the water damage to Plaintiffs' home was the direct result of the faulty workmanship and there was no subsequent intervening covered loss of the sort that would trigger coverage. The slow build-up of damage from water intrusion over time, argues Chubb, is not a covered loss that comes within the ensuing loss provision.

The nature of this debate is illustrated by the examples used by the parties to prove their respective points. Plaintiffs admit that if faulty roof workmanship causes leaking, then the faulty workmanship exclusion bars Plaintiffs' recovery of roof repair costs necessary to cure the faulty workmanship—for example, the cost of re-roofing. In that situation, Plaintiffs contend, the ensuing loss provision nonetheless requires coverage for costs to restore and repair the beams, walls, and carpeting that were damaged from water leaking through the roof. Chubb, on the other hand, argues that a better illustration of ensuing loss is a situation where water leaks through the faultily repaired roof causing an electrical short and a fire, which damages the house. In that case, the event of the fire and its aftermath is, in and of itself, an ensuing covered loss, while the faultily repaired roof that does not result in any covered loss event, such as a fire, is not.

As explained below, there are conflicting decisions in Minnesota and elsewhere regarding whether a policy's ensuing loss provisions provide coverage under the circumstances here. Take for example the two Minnesota cases cited by the parties in this case. In *Bloom v. West. Nat'l Mut. Ins. Co.*, No. A05–2093, 2006 WL 1806415, *2–3 (Minn.Ct.App. July 3, 2006), the trial court found the homeowner's policy lan-

guage ambiguous and determined that damages resulting from rot and mold were not excluded because they were covered as ensuing losses. But the Minnesota Court of Appeals reversed the trial court's decision, concluding that damages from water intrusion were excluded from coverage under the errors, omissions, and defects or wear and tear exclusions. *Id.* at *6. In *Buscher v. Econ. Prem. Assurance Co.,* No. 05–544, 2006 WL 268781, *5 (D.Minn. Feb. 1, 2006), on the other hand, Judge Kyle, applying Minnesota law, concluded that the construction defect exclusion did not exclude coverage for water loss or mold that resulted from the covered water loss.

In *Buscher,* the plaintiffs were owners of a single-family house, and the interior of the home sustained physical damage caused by major water leakage. The relevant exclusion provided that:

> [The Policy] doesn't cover loss to property insured by [the Policy] caused by one or more of the following:
> b. Defect, weakness, inadequacy, fault or unsoundness in:
> 1) planning, zoning, siting or development surveying;
> 2) design, specifications, workmanship, construction, grading, compaction;
> 3) materials used in construction or repair;
> 4) maintenance.

*Id. Buscher* turned on whether the policy exclusion barred coverage for water damage resulting from the construction defect. The court construed the exclusion as not excluding water damage resulting from a construction defect since [n]othing in the language of the construction defect exclusion indicates that it extends to any loss resulting, however remotely, from construction defects. *Id.* The court also noted that its conclusion was bolstered by, but not dependent on, the insurance adjusters'

testimony that water damage resulting from a construction defect is, as a general matter, covered under the policy and the insurer's handling of another claim consistent with such an interpretation of the Policy. *Id.* Here, on the other hand, Chubb's representatives testified that they nearly always deny claims that are concurrently caused by faulty construction and rain. (Pls.'s Mem. at 17–18.)

To be sure, many courts nationwide have interpreted the ensuing loss exception to the faulty construction exclusion in a manner endorsed by Plaintiffs and similar to *Buscher. See, e.g., Blaine Constr. Corp. v. Ins. Co. of N. Am.,* 171 F.3d 343, 350–353 (6th Cir.1999) (rejecting the argument that to be covered, ensuing loss must be the result of a new, separate, and independent peril rather than a loss that follows naturally and ordinarily from an excluded peril); *Eckstein v. Cincinnati Ins. Co.,* 469 F.Supp.2d 455, 461–62 (W.D.Ky. 2007) (holding that there is nothing ... to indicate that an ensuing loss must be the result of a separate cause from the excluded loss to indicate).

Other courts, however, have taken a narrower view of the ensuing loss provision impact on coverage. In *Bloom,* 2006 WL 1806415 at *2–5, the faulty construction of installed windows resulted in water intrusion which, in turn, resulted in wood rot and mold. The insurance policy excluded loss caused by faulty construction but the exclusion also contained an ensuing loss provision. There, the court rejected the insured's argument that coverage for the mold and rot was revived by virtue of the ensuing loss provision stating that:

> In order for mold and rot to take hold and cause injury, water or moisture must be present. Without faulty installation and workmanship ... the water and moisture should not have entered

the [plaintiffs'] home to produce mold and rot. The mold and rot was caused by water that entered the home, a direct result of faulty installation and workmanship. It is not a surprise that mold and rot were found due to water intrusion ... the water intrusion and resulting rot and mold are a single phenomenon. There was no intervening cause other than time.

*Id.* at *5.

In addition to *Bloom* in Minnesota, there is a wealth of authority elsewhere for Chubb's position that its ensuing loss provisions do not provide coverage under the circumstances of this case. Many courts have endorsed a narrower interpretation of the ensuing loss provisions in the faulty construction exclusions, holding that the ensuing loss cannot be directly related to defective construction. In other words, these courts require that an un-excluded peril, separate and distinct, ensue or result from the excluded faulty construction. *See, e.g., Prudential Prop. & Cas. Ins. Co. v. Lillard–Roberts,* No. 01–1362, 2002 WL 31495830, at *19 (D.Or. June 18, 2002) (stating that the ensuing loss clause applies in those rare cases where the reasonable damage expected to be caused by the excluded cause of loss leads to another peril that causes damage beyond that normally expected); *Montefiore Med. Ctr. v. Am. Prot. Ins. Co.,* 226 F.Supp.2d 470, 479 (S.D.N.Y.2002) (An ensuing loss provision does not cover loss cause by the excluded peril, but rather covers loss caused to other property wholly separate from the defective property itself.); *Narob Dev. Corp. v. INA,* 219 A.D.2d 454, 631 N.Y.S.2d 155 (1995) (Where a property insurance policy contains an exclusion with an exception for ensuing loss, courts have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk.).

Whether water damage is a separate peril that caused unforeseeable damage to Plaintiffs' property is fairly debatable. For one, it comes as no surprise that shoddy construction permitted the elements— water, air, and dirt—to penetrate Plaintiffs' house and eventually cause structural damage as well as damage to the carpets, rugs, wood framing, sheathing, and the like. Ultimately, because there are genuine issues of material fact regarding the sole, overarching cause of Plaintiffs' loss, it is far from clear whether Plaintiffs' loss would be covered even under the more liberal theory of ensuing losses endorsed by Plaintiffs. And at this point the Court can only speculate whether Plaintiffs' loss arose directly or remotely out of faulty construction or some other excluded event, and whether that loss was proximately caused by water damage. Regardless, Chubb's position that the ensuing loss provision should be interpreted as a causation-in-fact-breaking link in coverage exclusion—i.e., permitting only independent, non-foreseeable losses caused by faulty construction—is, at a minimum, fairly debatable and therefore precludes a finding of bad faith.

Because the Court finds that Chubb's denial of coverage was reasonable—even if ultimately wrong—it need not address the second prong of the bad-faith test: whether Chubb knew of the lack of a reasonable basis for denying the benefits of the insurance policy or acted in reckless disregard of the lack of a reasonable basis to do so. Minn.Stat. § 604.18. Notably, however, the only evidence proffered by Plaintiffs in support of this criterion is that Chubb apparently did not provide manuals to its claim representatives on how to read ambiguous language in the policies and apply relevant Minnesota law. As explained above, it is far from clear whether Plain-

tiff's Policy is ambiguous and which theory of ensuing losses should apply here. And there is no evidence that when Chubb denied Plaintiffs' coverage it actually believed that its basis was unreasonable in fact or law. In sum, the evidence proffered by Plaintiffs does not support a finding of bad faith. Accordingly, Plaintiffs' motion to amend is denied.